IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | (Jointly Administered) |
| LMI LEGACY HOLDINGS, INC., | ) | |
| | ) | Case No. 13-12098 (CSS) |
| Reorganized Debtors. | ) | |
| _____ | ) | |
| EDWARD L. LIPSCOMB, AS SPECIAL GUC | ) | |
| TRUSTEE OF THE LMI GUC TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 15-51069 (CSS) |
| | ) | |
| CLAIRVEST EQUITY PARTNERS | ) | |
| LIMITED PARTNERSHIP, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION[1]

**MORRIS JAMES LLP**
Stephen M. Miller
Carl N. Kunz
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
            -and-
**CHAPMAN AND CUTLER LLP**
David T.B. Audley
Sara T. Ghadiri
111 West Monroe Street
Chicago, IL 60603-4080
            -and-
**CHAPMAN AND CUTLER LLP**
Laura E. Appleby
1270 Avenue of the Americas

**LANDIS ROTH & COBB LLP**
Kerri K. Mumford
James S. Green, Jr.
Joseph D. Wright
Anne M. Steadman
919 Market Street, Suite 1800
Wilmington, DE 19801


Counsel to Edward L.
Lipscomb, as Special Trustee
of the LMI GUC Trust

**MARKS, O'NEILL, O'BRIEN
DOHERTY & KELLY, P.C.**
Michael F. Duggan
Emily K. Silverstein

---

[1]  "The court is not required to state findings or conclusions when ruling on a motion under Rule 12…" Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

New York, NY  10020

Counsel for Clairvest Equity
Partnership Limited Partnership,
Clairvest Group, Inc., Clairvest
Acquisition LLC, Clairvest GP
Manageco, Inc., David Sturdee
Kenneth B. Rotman, Aly Champsi
Alan Torrie, and Sidney M. Horn

**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan
Etta R. Mayers
T. Brad Davey
1313 North Market Street, Sixth Floor
Wilmington, DE  19899
          -and-
SEYFARTH SHAW LLP
Gregory A. Markel
Heather Murray
One World Financial Center
New York, NY  10281

Counsel to RBC Capital Markets, LLC

300 Delaware Avenue, Suite 900
Wilmington, DE  19801

Counsel for Defendants David
Finley, Clifford Schorer, and
Thomas Blum

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**
Nemours Building
Thomas D. Walsh
1007 North Orange Street, Suite 600
Wilmington, DE  19899
          -and-
**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**
Gregory W. Fox
Sarah Kleinman
2000 Market Street
Suite 2300
Philadelphia, PA  19103

Counsel for Defendants,
Louis Rocco and Saverio Burdi

Dated: April 27, 2017

Sontchi, J. _____

## INTRODUCTION

Before the Court is a Complaint brought by Edward S. Lipscomb, as special GUC Trustee of the LMI GUC Trust, alleging various claims against various parties associated with LMI, Clairvest, and the failed LMR merger.

The below chart identifies all Claims contained in the Trustee's Complaint. Additionally, each party against whom a respective Claim was brought is identified, as well as the "Defendant Group" to which they belong, respectively.  The following analysis will largely be conducted and organized according to the different Defendant Groups, to the extent relevant facts do not warrant an individual Defendant's separate analysis with respect to a given Claim.

Those items highlighted in grey signify that the specified Defendant has not moved to dismiss the associated Claim, and, as such, will not be addressed in this Opinion.

| Count | Claim | Defendant | Defendant Group |
|-------|-------|-----------|-----------------|
| I | Breach of Fiduciary Duties against Board | (i) Sturdee, Rotman, Champsi, Horn, Torrie;<br>(ii) Rocco;<br>(iii) Finley, Schorer, Blum | (i) Clairvest (Directors)<br>(ii) LMI Management<br>(iii) Non-Clairvest Directors |
| II | Breach of Fiduciary Duties | (i) CLP, CGI, CLA, CGM;<br>(ii) Sturdee, Rotman, Champsi, Horn, Torrie | (i) Clairvest (Entities)<br>(ii) Clairvest (Directors) |
| III | Breach of Fiduciary Duties | Rocco, Burdi | LMI Management |
| IV | Avoidance and Recovery of Intentional Fraudulent Transfer | Rocco, Burdi | LMI Management |
| V | Avoidance and Recovery of Constructive Fraudulent Transfer | Rocco, Burdi, Accumanno | LMI Management |
| VI | Avoidance and Recovery of Intentional Fraudulent Transfer | RiteCare | RiteCare |
| VII | Avoidance and Recovery of Constructive Fraudulent Transfer | RiteCare | RiteCare |
| VIII | Turnover of Property of the Estate | Rocco, Burdi | LMI Management |
| IX | Breach of Contract - Officer Notes | Rocco, Burdi | LMI Management |
| X | Equitable Subordination and Disallowance of Claims | (i) CLP, CGI, CLA, CGM;<br>(ii) Blum;<br>(iii) Rocco, Burdi | (i) Clairvest (Entities)<br>(ii) Non-Clairvest Directors<br>(iii) LMI Management |
| XI | Recharacterization of Notes as Equity | (i) CLP, CGI, CLA, CGM;<br>(ii) Blum;<br>(iii) Rocco, Burdi | (i) Clairvest (Entities)<br>(ii) Non-Clairvest Directors<br>(iii) LMI Management |
| XII | Breach of Fiduciary Duties Relating to the Notes | (i) CLP, CGI, CLA, CGM;<br>(ii) Sturdee, Rotman, Champsi, Horn, Torrie;<br>(iii) Blum;<br>(iv) Rocco, Burdi | (i) Clairvest (Entities)<br>(ii) Clairvest (Directors)<br>(iii) Non-Clairvest Directors<br>(iv) LMI Management |
| XIII | Aiding and Abetting Breach of Fiduciary Duty | RBC | RBC |
| XIV | Breach of Contract - Engagement Letter | RBC | RBC |
| XV | Avoidance and Recovery of Preferential Transfer | CGM | Clairvest (Entities) |
| XVI | Avoidance and Recovery of Intentional Fraudulent Transfer | CGM | Clairvest (Entities) |
| XVII | Avoidance and Recovery of Constructive Fraudulent Transfer | CGM | Clairvest (Entities) |
| XVIII | Claim Objection | (i) CLP, CGI, CLA, CGM;<br>(ii) Blum;<br>(iii) Rocco, Burdi, Accumanno | (i) Clairvest (Entities)<br>(ii) Non-Clairvest Directors<br>(iii) LMI Management |

## **BACKGROUND**

Before filing for bankruptcy in 2013, LMI[2] and its affiliates collectively operated as

a regional home medical equipment supplier in the northeastern United States.[3]  Most of

LMI's sales and rentals were paid for by third party payer groups.  Since 2002, certain

Medicare contracts have been periodically awarded through a competitive bidding

---

[2]  LMI is incorporated in New York, not Delaware, as previously stated by this Court in *In re LMI Legacy Holdings, Inc.*, 553 B.R. 235, 255 (Bankr. D. Del. 2016).

[3]  Adv. Pro. No. 15-51069, D.I. 4, ¶ 36 (the "Complaint").  Hereinafter, references to the Adversary Proceeding will be indicated by "Adv. D.I. ___" and references to the main bankruptcy proceeding will be indicated by "D.I. ___," unless otherwise defined.

process ("*Competitive Bidding*") run by the Center for Medicare Services ("*CMS*"); bids are evaluated based on the bidder's eligibility, financial stability and the bid price.[4] Approximately 35% of LMI's historical revenues were derived directly from Medicare and Medicaid programs.[5]

Clairvest, a Toronto-based private equity firm,[6] was LMI's controlling shareholder pre-petition; on the petition date, Clairvest owned a 62.5% equity interest in LMI.[7] Clairvest also controlled LMI's Board through its power to nominate five of the nine members of LMI's Board (the "*Clairvest Board Members*" and the "*Board,*" respectively).[8] Clairvest began investing in LMI through its private equity funds in December 2002 and quickly obtained a controlling position in LMI.[9]  Clairvest also holds a claim against the estate for $5.2 million derived from three loans made to LMI between March 2010 and February 2011; Clairvest's claim accounts for approximately 30% of the Debtors' estimated general unsecured creditor pool.[10]   The Trustee currently seeks to re-characterize these notes as equity.[11]

---

[4] *Id.* at ¶ 38.

[5] *Id.* at ¶ 37-39.

[6] *Id.* at ¶ 2.

[7] *Id.* at ¶ 40.

[8] *Id.* at ¶ 41.

[9] *Id.* at ¶ 42.

[10] *Id.* at ¶ 43.

[11] *Id.* at ¶ 44.

In 2011, LMI initiated a sale process and retained RBC as its investment banker.[12] The Trustee alleges that the Clairvest Board Members initiated this sale process and signed an engagement letter with RBC before involving the non-LMI Board Members.[13] RBC was an investor in a separate Clairvest fund and apparently this preexisting relationship was not disclosed to the Board.[14]   The Complaint alleges that RBC only communicated with and reported to Clairvest and its Board Members.   The Trustee asserts that RBC never appeared at a Board meeting during 2011 and 2012.[15]   This initial sale process apparently ended in May of 2012, without a single acceptable bid having been received.[16]   It is unclear what constituted an "acceptable bid," but the Trustee alleges that Clairvest—not LMI—had provided RBC with guidelines for what would be acceptable.[17]   The Trustee believes that Clairvest received offers that valued LMI in excess of $70 million.[18]

After a number of years of growth, LMI's revenue peaked in 2011 with reported net revenue of $139,656,000.   LMI's net revenue fell slightly to $137,160,000 in fiscal year 2012 and suffered a steeper fall to $128,500,000 in fiscal year 2013.   LMI's EBITDA those

---

[12] *Id.* at ¶ 69-71.

[13] *Id.*

[14] *Id.* at ¶ 69-73.

[15] *Id.* at ¶ 73-80.

[16] *Id.* at ¶ 78.

[17] *Id.* at ¶ 73-80.

[18] *Id.* at ¶ 87.

three years was $12,034,000, $18,524,000 and $13,200,000, respectively.[19]   The primary cause of LMI's bankruptcy filing was not its profitability or cashflow in 2011-2013, but its failure to win a single service area in Medicare's 2013 Competitive Bidding.[20]   LMI's bids were rejected, despite their competitive pricing, because CMS determined that LMI might not be financially capable of providing the services upon which it had bid.[21]   LMI received notification that it had been disqualified from Competitive Bidding on January 30, 2013.[22]

Clairvest apparently anticipated a negative ruling from CMS and had already renewed its effort to sell LMI.  By the end of January of 2013, Clairvest had negotiated a non-disclosure agreement with a potential suitor.[23]   By March 2013, Clairvest had begun negotiating with Passaic Healthcare Services, LLC, d/b/a Allcare Medical ("*Allcare*").  On March 4, 2013, for the first time after CMS's ruling, LMI's Board met and began discussing sale and merger options.  The minutes appear to show that Clairvest and its Board Members did not disclose the negotiations with Allcare, the letter of intent Clairvest had received from Allcare that day, or discuss RBC's involvement in a new sale process.[24]

Over the following months, a number of transactions were explored by the Board; Board Members independently pursued different potential transactions, which resulted

---

[19]  First Day Declaration of Alan J. Landauer, Case No. 13-12098, D.I. 3, ¶ 16 (hereinafter, the "Landauer Decl.").

[20]  *Id.* at ¶ 35-40.

[21]  First Day Hearing Transcript, D.I. 100, p. 6, ln. 15-24.

[22]  Complaint at ¶ 92.

[23]  *Id.* at ¶ 95.

[24]  *Id.* at ¶ 95-96.

in growing internal strife.[25]  Eventually, LMI entered into a letter of intent with Allcare

on April 29, 2013.[26]  The Trustee alleges that there are no Board minutes indicating that

the Board approved this sale or was aware that this LOI had been executed and signed.[27]

After receiving offers from two other companies, the Trustee alleges that Clairvest sought

to expeditiously finalize a deal with Allcare, exclusive of the Board.[28]   At the May 13,

2013 Board meeting, Champsi—not RBC nor the Special Committee—provided updates

regarding the current M&A transactions being pursued, and specifically reported that

the most serious proposal received was from Allcare.[29]  On May 16, 2013, Allcare and

LMI issued a press release announcing their merger.[30]

However, on May 20, 2013, LMI was notified that the U.S. Attorney General's

office had initiated a civil investigative demand (the "CID") with respect to alleged

violations by LMI under the Federal False Claims Act.[31]  Upon notification of the CID by

LMI, Allcare demanded renegotiation of their previously announced merger agreement,

with the aim of mitigating any potential risk associated with the CID.[32]  Following the

renegotiation with Allcare, the merger talks broadened to include two other companies,

Medstar and Ocean, with LMI entering into a three-way merger with the two

---

[25]  *Id*. at ¶ 98-139.

[26]  Landauer Decl. at ¶ 42.

[27]  Complaint at ¶ 106-108.

[28]  *Id*. at ¶ 117.

[29]  *Id*. at ¶ 121.

[30]  *Id*. at ¶ 123.

[31]  *Id*. at ¶ 124.

[32]  *Id*. at ¶ 125.

companies.[33]  However, after approval of the merger with Ocean and Medstar, Ocean backed out, and a different three-way merger went forward.[34]  On June 17, 2013, the Board, after calling a special meeting of shareholders, approved a plan for a LMI – Medstar – Rite Care merger (the "LMR Merger"), notwithstanding unresolved compliance issues relating to the Rite Care acquisition.[35]  Despite Board approval, by early July 2013, LMI's banks had not yet approved the Merger.[36]  On July 10, 2013, LMI reached a compromise with TD Bank, whereby the bank would consent to the LMR Merger and later be responsible for an intercreditor agreement with Medstar.[37]  The Complaint asserts that "[t]his compromise would have led to the consent from TD Bank required to consummate the LMR Merger, potentially ultimately saving [LMI]."[38]

However, within twelve hours of TD Bank's compromise, Rocco and Burdi resigned from their positions at LMI and joined Allcare, taking with them key employees of LMI.[39]  As a direct result of Rocco and Burdi's resignations, TD Bank withheld its consent to the LMR Merger, and declared a material adverse change under its credit agreement with LMI.[40]  In July 2013, LMI's Senior Secured Lenders asserted that an event

---

[33]  *Id.* at ¶ 131.

[34]  *Id.* at ¶ 134.

[35]  *Id.*

[36]  *Id.* at ¶ 145-46.

[37]  *Id.* at ¶ 149.

[38]  *Id.*

[39]  *Id.* at ¶ 150-154.

[40]  *Id.* at ¶ 159.

of default had occurred and began restricting LMI's access to cash collateral.[41]  LMI and

its affiliates declared bankruptcy on August 16, 2013 with a pre-negotiated stalking horse,

Quadrant Management Inc., and a plan to sell the Debtors' businesses at auction.[42]

On September 25, 2013, the Official Committee of Unsecured Creditors, LMI DME

Holdings, LLC, and Quadrant Management Inc. entered into a settlement agreement that

provided for the creation of the General Unsecured Trust (the "*GUC Trust*").  This Court

approved the Settlement Agreement on October 22, 2013.[43]  The Debtors' Plan of

Reorganization was filed on March 13, 2014[44] and approved on April 28, 2014.[45]  The

Settlement Agreement, Plan, and Confirmation Order transferred to the GUC Trust the

right to prosecute certain claims of the Debtors.[46]

On August 14, 2015, Edward L. Lipscomb, as Special Trustee of the LMI GUC

Trust, filed a Complaint alleging eighteen claims against various parties associated with

LMI, Clairvest, and the failed LMR merger.

## DISCUSSION

### I.    Rule 12(b)(6) Standard of Review

The Defendants seek dismissal of various Claims brought by the Trustee in the

Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made

---

[41]  *Id.* at ¶ 47.

[42]  *Id.* at ¶ 49-50.

[43]  *See* D.I. 282.

[44]  *See* D.I. 650.

[45]  *See* D.I. 761.

[46]  Joint Plan of Liquidation, D.I. 650, p. 7 (definition of "GUC Trust Causes of Action").

applicable here by Federal Rule of Bankruptcy Procedure 7012, for "failure to state a claim upon which relief can be granted." Fundamentally, a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[47]  As such, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[48]

   With the Supreme Court's decisions in *Bell Atlantic Corp v. Twombly*[49] and *Ashcroft v. Iqbal,*[50] "pleading standards have shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[51]  As a threshold matter, therefore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'"[52]  Given this heightened standard, it is insufficient to simply provide "thredbare recitals of the elements of a cause of action, supported by mere conclusory statements. …"[53]  Thus, a complaint "must contain either

---

[47] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993).

[48] *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

[49] 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

[50] 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

[51] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.2009).

[52] *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[53] *Iqbal,* 129 S.Ct. at 1949 (citing *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

direct or indirect allegations respecting all the material elements necessary to sustain recovery under some *viable* legal theory."[54]

Following *Twombly* and *Iqbal*, in *Fowler*, the Third Circuit articulated a two-part analysis to be applied when evaluating a complaint.[55]  First, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[56] Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' "[57]  Additionally, the Third Circuit has instructed that "[s]ome claims will demand relatively more factual detail to satisfy this standard, while others require less."[58]

## II.    Choice of Law

The instant Complaint contains a large number of claims, some of which require a choice of law analysis.

Within the context of bankruptcy proceedings, choice of law analyses are lacking in clarity, specificity, and consistent application by the courts.  First, as a threshold matter, there must exist a true conflict between applicable state laws for a choice-of-law analysis to be triggered.[59]

---

[54] *Twombly,* 550 U.S. at 562, 127 S.Ct. 1955.

[55] *Fowler*, 578 F.3d at 210-11.

[56] *Id.*

[57] *Id.*

[58] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir.2010).

[59] *In re PMTS Liquidating Corp.*, 452 B.R. 498, 510 (Bankr. D. Del. 2011); *See, e.g., Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) (citing *On Air Entm't Corp. v. Nat'l Indem. Co.*, 210 F.3d 146, 149 (3d Cir. 2000)) ("These provisions presuppose a conflict between the law of the forum state and the law of the state with the most significant relationship. This is because courts typically wade into choice-of-law determinations when

After a conflict between potentially applicable substantive state laws has been discerned, the Court must then determine the appropriate choice-of-law rule to be applied to the conflict—the federal or state choice-of-law rule. However, there is substantial disagreement amongst the courts regarding the determination of the applicable choice-of-law rule, specifically in the context of bankruptcy proceedings.

In *Klaxon Co. v. Stentor Electric Manufacturing Co.*,[60] the Supreme Court extended the holding of *Erie Railroad Co. v. Tompkins*[61] to state choice-of-law rules. Thus, *Klaxon* made clear that a federal court sitting in diversity must apply the complete law of the state, including the state's choice-of-law rules. However, the Supreme Court has yet to extend the *Klaxon* ruling to cases in which jurisdiction is predicated upon a federal question, thus, the Supreme Court's lack of clear guidance has ultimately served as the catalyst for the current disagreement among the courts with respect to choice of law determinations.[62]

---

those laws truly conflict"); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 353 (3d Cir. 2007), as amended (Oct. 12, 2007) ("While there are no reported Delaware cases on this point, we predict that Delaware would follow the practice of the federal system and most states, and decide a choice-of-law dispute only when the proffered legal regimes actually conflict on a relevant point").

[60] 313 U.S. 487, 496 (1941). *See also* Jackie Gardina, The Perfect Storm: Bankruptcy, Choice of Law, and Same-Sex Marriage, 86 B.U. L. Rev. 881 (2006) ("To support its conclusion, the Court reasoned that the forum state's rules needed to be applied because '[o]therwise, the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side.' According to the Court, '[a]ny other ruling would do violence to the principle of uniformity within a state, upon which the [Erie] decision is based' (internal citations omitted)).

[61] 304 U.S. 64, 77-79 (1938). *See also* Jackie Gardina, The Perfect Storm: Bankruptcy, Choice of Law, and Same-Sex Marriage, 86 B.U. L. Rev. 881 (2006) ("In Erie, the Supreme Court held that a federal court exercising diversity jurisdiction must apply state common law and declared that '[t]here is no federal general common law.' Id. at 78. In doing so, the Court overruled *Swift v. Tyson*, under which federal courts sitting in diversity had been able to ignore the declarations of the state's highest court and instead use their own judgment to determine what a state's common law was").

[62] Jackie Gardina, The Perfect Storm: Bankruptcy, Choice of Law, and Same-Sex Marriage, 86 B.U. L. Rev. 881 (2006).

As a result of the uncertainty surrounding *Klaxon's* applicability to cases in which a federal court's jurisdiction is predicated upon the presence of a federal question, three separate methodologies have been adopted by the courts when confronted with a conflict of laws.[63]  The first methodology is comprised of courts, when confronted with a case where jurisdiction is predicated upon the presence of a federal question, seizing upon dictum in *Vanston*, apply a federal choice-of-law rule, and therefore adopting the *Restatement (Second) of Conflicts of Laws*, which takes the form of a "most significant relationship" test.[64]  Second, other courts take the opposite approach and apply *Klaxon* under the assumption that the forum's choice of law rule is always applicable.[65]  Lastly, and embracing a less absolute approach, some courts hold that *Klaxon* is applicable absent the presence of an overriding federal interest.

The judges within the Delaware Bankruptcy Court are split as well.  While some have adhered to the *Klaxon* rule approach—applying the forum's choice-of-law rule regardless—others have adopted a less categorical approach and apply *Klaxon* absent an overriding federal interest.  In the instant case, the Court adopts the less categorical approach and will apply the forum's choice of law rule absent an overriding federal interest.

---

[63] *In re Kaiser Grp. Int'l Inc.*, No. 00-02263-MFW, 2010 WL 3271198, at *4 (Bankr. D. Del. Aug. 17, 2010) (not reported).

[64] Jackie Gardina, The Perfect Storm: Bankruptcy, Choice of Law, and Same-Sex Marriage, 86 B.U. L. Rev. 881 (2006).

[65] *Id.*

14

Generally, when confronted with a conflict of potentially applicable state laws, Delaware courts look to the Restatement (Second) of Conflict Laws, and apply the "most significant relationship test" for actions sounding in tort or contract, and the "internal affairs doctrine" for actions related to fiduciary duties.

The "most significant relationship" test, as defined in section 145(1) of the Restatement (Second) of Conflict Laws, provides: "the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."[66]  Section 145(2) enumerates the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the places where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.[67]

---

[66]  Restatement (Second) of Conflict of Laws § 145(1) (1971).

[67]  *Id.* at § 145(2).

### III.    Trustee's Claims

*A.  Breach of Fiduciary Duty Claims (Counts I, II, III)*

As previously discussed, Delaware courts apply the internal affairs doctrine to claims alleging breach of fiduciary duties.  Under the internal affairs doctrine, one state alone has the authority to regulate a corporation's internal affairs, otherwise a corporation could be faced with conflicting demands.[68]  Case law has defined internal affairs as "those matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders."[69]  The state under which LMI is incorporated is New York.[70]  As such, with respect to claims alleging breaches of fiduciary duties, this Court will apply New York law in determining whether the claims are sufficiently pled.

Under New York law, to assert a breach of fiduciary duty, the Plaintiff must show (i) breach by a fiduciary of a duty owed to plaintiff, (ii) defendant's knowing participation in the breach, and (iii) damages.[71]  As a threshold matter, it is well-established under New York law that the business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."[72]  However, "directors and officers of a company must earn the protections of the business judgment rule by meeting minimum

---

[68] *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

[69] *Id.*

[70] Complaint at ¶ 33.

[71] *SCS Commuc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004).

[72] *Auerbach v. Bennett*, 47 N.Y.2d 619, 620 (N.Y. 1979).

standards of care in the *process* by which their decisions are made," in addition to owing "a duty of loyalty to the corporations they serve."[73]  Therefore, this Court must first analyze the two components to a director's fiduciary duties to a corporation: duty of care and duty of loyalty and good faith.[74]

Under New York law, "[a] director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."[75]  The duty of due care, therefore, requires directors to make decisions on an informed basis.[76]

In order to establish a breach of duty of care, Plaintiff need only "establish that the offending parties' actions were a 'substantial factor' in causing an identifiable loss."[77]  However, *RSL Communications PLC ex rel. Jervis v. Bildirici* observed that, when conducting an analysis into breach of fiduciary duties, it is not surprising that such an

---

[73] *In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746, 795 (S.D.N.Y. 2012).

[74] *See Friedman v. Wahrsager*, 848 F.Supp.2d 278, 288 (E.D.N.Y. 2012); *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984).

[75] N.Y. Bus. Corp. Law § 717(a).

[76] *Hanson Trust, Plc. v. ML SCM Acquisition Inc.*, 781 F.2d 264, 274 (2d Cir. 1986) (internal quotations and citations omitted); *see also Roselink Investors v. Shenkman*, 386 F.Supp.2d 209, 220 (S.D.N.Y. 2004) ("[D]irectors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them.") (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[77] *RSL Commc'ns PLC ex rel. Jervis v. Bildirici*, No. 04-CV-5217 (KMK), 2006 WL 2689869, at *5 (S.D.N.Y. Sept. 14, 2006) (internal citations omitted).

"inquiry often raises factual questions which normally are not properly resolved on a motion to dismiss."[78]

Additionally, the presence of an exculpatory clause in a company's Certificate of Incorporation is relevant to an inquiry of liability for breach of the duty of care. Section 402(b) of the New York Business Corporation Law provides that a "certificate of incorporation may set forth a provision eliminating or limiting the personal liability of directors to the corporation or its shareholders for damages for any breach of duty in such capacity."[79] Absent bad faith or financial profit, the existence of such an exculpation clause can form the basis for dismissal of a claim alleging breach of duty of care.[80]

The failure to act in good faith may be shown "where the fiduciary intentionally acts with a purpose other than for advancing the best interests of the corporation. . .acts with the intent to violate applicable positive law, or. . .intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[81]

The duty of loyalty further demands that an officer or director "may not assume and engage in the promotion of personal interests which are incompatible with the

---

[78] *Id.* (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("[T]he proximate cause element of common law fraud ... is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."); *Malin v. XL Capital Ltd.*, No. 3:03 Civ.2001, 2005 WL 2146089, at *4 n. 5 (D. Conn. 2005); *F.D.I.C. v. Bober*, No. 95 Civ. 9529, 2002 WL 1929486, at *3 (S.D.N.Y. Aug. 19, 2002) ("Whether [defendant director's] failure to attend the [board] meetings caused the losses and whether the outcome would have been different had [defendant] actually attended the meetings are questions of causation that rely on disputed facts.")).

[79] N.Y. Bus. Corp. Law § 402(b).

[80] *See In re IT Grp. Inc.*, No. 02-10118, 2005 WL 3050611, at *11 (D. Del. Nov. 15, 2005); *In re Ampal-Am. Israel Corp.*, 543 B.R. 464, 472-73 (S.D.N.Y.2016).

[81] *In re Ampal-Am. Israel Corp.*, 543 B.R. at 475 (internal citations omitted). *See also Geltzer v. Bay Harbour Mgmt. LC (In re BH S & B Holdings LLC)*, 807 F.Supp.2d 199, 200 n. 4 (S.D.N.Y. 2011).

superior interests of their corporation."[82]  Self-interestedness is a hallmark of breach of ones duty of loyalty.  As such, some courts have held that "[t]he test for self-interestedness is…whether [the director] will 'receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally."[83]  Yet, other courts have found that a director is considered to have lost his independence at the moment he becomes "dominated or otherwise controlled by an individual or entity interested in the transaction at issue."[84]

Where New York law is not as robust as Delaware law regarding matters of fiduciary duties, New York courts have looked to Delaware law for guidance.[85]  The Delaware Court of Chancery has been notably direct in stating that "[a] stockholder is controlling, and owes fiduciary duties to the other stockholders, 'if it owns a majority interest in or *exercises control* over the business affairs of the corporation.' "[86]  In the alternative, however, as the Clairvest-related parties pointed out in their motion to dismiss, some New York courts have found that "[m]ere ownership of a majority or all of the stock of a corporation" does not necessarily equate to being in a position of domination.

---

[82] *Foley v. D'Agostino*, 21 A.D.2d 60, 248 N.Y.S.2d 121, 128 (1964).

[83] *Stein v. Immelt*, 472 Fed.Appx. 64, 66 (2d Cir.2012) (quoting *Marx*, 644 N.Y.S.2d 121, 666 N.E.2d at 1042).

[84] *Higginsv. N.Y. Stock Exchange, Inc.*, 10 Misc. 3d 257, 286, 806 N.Y.S.2d 339, 357 (N.Y. Sup. 2005).

[85] *Fox v. Koplik (In re Perry H. Koplik & Sons, Inc.)*, 476 B.R. 746, 795 (S.D.N.Y. 2012).

[86] *Calesa Associates, L.P. v. American Capital, Ltd.*, No. CV 10557-VCG, 2016 WL 770251, at *10 (Del. Ch. Feb. 29, 2016) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (emphasis in original)).

In its complaint, the Trustee alleges various fiduciary duty-related claims against the Board of Directors and Clairvest. As previously noted, the foregoing analysis will be organized according to the previously defined Defendant Groups. The Claims addressed in this section are:

- <u>Count I</u>: Breach of Fiduciary Duty against the Board (Clairvest Directors, LMI Management, and Non-Clairvest Directors)

- <u>Count II</u>: Breach of Fiduciary Duties against Clairvest and the Clairvest Board Members (Clairvest Directors, Clairvest Entities)

- <u>Count III</u>: Breach of Fiduciary Duties against Rocco and Burdi (LMI Management)

    *1. Clairvest Entities and Clairvest Directors (Counts I and II)*

Counts I and II allege breaches of fiduciary duty against those individuals and entities affiliated with Clairvest, thus they will be addressed together. The Trustee's claims alleging breaches of fiduciary duties against Clairvest-affiliated parties are predicated on the argument that Clairvest dominated the LMI Board, ultimately usurping control of the sale process to LMI's detriment.[87]

Under New York law, the presence of an exculpation provision in a company's certificate of incorporation largely insulates a corporation's directors from liability predicated upon "negligent acts or omissions," and ultimately serves to protect directors against claims for breach of the duty of care.[88] The Trustee must, therefore, allege in the

---

[87] Adv. D.I. 99 at 9.

[88] *In re Ampal-Am. Israel Corp.*, 543 B.R. at 473 (However, section 402(b) identifies five types of conduct that *cannot* be exculpated: (1) bad faith, (2) intentional misconduct, (3) knowing violation of law, (4) financial profit or other advantage to which the director was not legally entitled, and (5) violations of 719 of the Business Corporation Law. N.Y. Bus. Corp. Law § 402(b)).

Complaint that the Clairvest Directors and Clairvest Entities acted in bad faith or stood to gain a specific financial profit to which they were not legally entitled to in order for a claim to establish breach of duty of due care.

Notably, the Trustee, in his answering brief, only addresses the exculpatory provision under Third Circuit case law.[89]  Applying Third Circuit precedent and case law is not only inapplicable, it is incorrect as a matter of law pursuant to necessary choice of law analysis requiring Delaware courts to apply the law of the state of incorporation for matters relating to internal affairs of the company—in the instant case, New York.

Under New York law, "invoking the phrase 'bad faith' does not transform an exculpated claim into an unshielded claim."[90]  The Trustee does not allege that, notwithstanding Clairvest's pre-existing relationship with RBC, LMI should not have hired RBC or that another bank would have enabled LMI to reach a different result. Furthermore, the law of New York imposes even stricter requirements for pleading and proving bad faith, such that "the pleader must do more than add the words 'bad faith' to the complaint.[91]  As Judge Bernstein aptly remarked in *In re Ampal-American Israel Corp.*, "[a]ssuming [the Complaint] states a claim for breach of duty, it does not allege dishonesty or an improper purpose, and the mere invocation of "bad faith" does not transform the claim into something it's not."  Thus, the exculpatory provision in LMI's certificate of incorporation sufficiently shields members of the board of directors from

---

[89] Adv. D.I. 123 at 15.

[90] *In re Ampal-Am. Israel Corp.*, 543 B.R. at 479.

[91] *Id.*

liability predicated upon breach of duty of care.  As such, this Court finds that Clairvest Directors and Clairvest Entities did not breach their duty of care under New York law.

Courts have, at times, found the distinction between an exculpable lack of due care and a non-exculpable lack of loyalty and good faith difficult to discern.   In turning to Delaware law, New York courts have found lack of due care involves:

> [F]iduciary action taken solely by reason of gross negligence and without any malevolent intent." *Id.* at 64.  Gross negligence includes "a failure to inform one's self of available material facts," and without more, cannot constitute bad faith. *Id.* at 64–65.  Instead, bad faith involves either subjective bad faith where the fiduciary is motivated by an actual intent to do harm, *id.* at 64, or a conscious disregard of one's fiduciary duties involving "misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision.[92]

New York law is well-settled in that "conclusory allegations of 'bad faith' are insufficient to survive a motion to dismiss.  Rather, the complaint must state some set of facts from which it may be inferred that the directors' actions might have been motivated by an improper purpose."[93]

The Trustee alleges that the improper purpose motivating both the Clairvest Directors' and Entities' actions were their "single-minded pursuit of liquidating their preferred shares,"[94] however, the Complaint does not present any facts that Clairvest or the Clairvest Directors received any personal benefit – in fact, the Board attempted to complete a merger with TD Bank.  However, it was the departure of LMI management

---

[92] *Id.* at 475.

[93] *Stoner v. Walsh*, *772* F.Supp. 790, 806–07 (S.D.N.Y. 1991).

[94]  Adv. D.I. 123 at 14.

that led to TD Bank withdrawing its consent to the proposed LMI Merger, citing a material adverse change, *not* anything that could be reasonably tied to actions by either Clairvest or the Clairvest Directors.[95]

As such, given that neither Clairvest nor the Clairvest Directors breached any duty owed to LMI, they are afforded the business judgment rule.  Under New York law, the Complaint, in charging a breach of fiduciary duty, "must plead around the business judgment rule.  To survive a motion to dismiss, the [C]omplaint must allege that the director or officer acted fraudulently or in bad faith, disinterested independence, or acted without due care or reasonable diligence."[96]  The Trustee's Complaint paints a broad picture of Clairvest and the Board engaging in activity that was questionable, to say the least.  However, the instant Claims are duty of care claims, and not duty of loyalty claims, although, this Court will notes that Clairvest and the Clairvest Directors did not follow best practices during the course of the attempted Merger.  In analyzing each element for a breach of duty of fiduciary duties under the standard of a 12(b)(6) motion to dismiss, the Court will grant Clairvest's motion to dismiss, and dismiss, with prejudice, Counts I and II against the Clairvest Entities and Clairvest Directors, as the Trustee has failed to state a claim upon which relief can be granted.

---

[95] Adv. D.I. 99 at 14.

[96] *Patrick v. Allen*, 355 F.Supp.2d 704, 711 (Bankr. S.D.N.Y. 2005).

### 2.  Independent Directors (Count I)

For the aforementioned reasons, the Court will dismiss, with prejudice, Count I against the LMI Independent Directors, Messrs. Finley, Schorer, and Blum.

### 3.  LMI Management (Counts I and III)

For the aforementioned reasons, the Court will dismiss with prejudice, Count I against Mr. Rocco, and Count III against both Messrs. Rocco and Burdi.

### B.  Breach of Fiduciary Duty Claims Relating to the Notes (Count XII)

The factual allegations underpinning Count XII in large part derive from the same facts alleged in both the Breach of Fiduciary Duty claims (Counts I, II, III), *supra*, in addition to the Equitable Subordination claim (Count X), *infra*.  Counts XII, breach of fiduciary duty relating to the Notes, is ultimately seeking damages, *not* equitable relief, and is therefore barred by the statute of limitations.  Specifically, Count XII expressly seeks a monetary judgment "in an amount to be determined at trial," and, therefore, under New York law, the three-year statute of limitations applies.[97]  The longer, six-year fraud statute is inapplicable as Count XII seeks monetary damages, and not equitable relief.  Thus, Count XII will be dismissed, with prejudice.

### C.  Aiding and Abetting Breach of Fiduciary Duty Claim (Count XIV)

Under New York law,[98] "[t]he party asserting a claim for aiding and abetting a breach of fiduciary duty must plead and prove that (1) the fiduciary breached his

---

[97] *See Carbon Cap. Mgmt., LLC v. Am. Express Co.*, 88 A.D.3d 933, 939 (1st Dep't 2011).

[98] As LMI is incorporated in New York, Delaware choice of law rules dictate that the law of the state of incorporation applies to matters relating to the corporate affairs of a company.

obligations to another, of which the aider and abettor had "actual knowledge,"[99] (2) the defendant knew of the breach and gave substantial assistance, and (3) the plaintiff suffered damages as a result."[100] New York courts have found that a defendant provided "substantial assistance" when he "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed."[101]

Fundamentally, the Complaint fails to plead adequately virtually every element required for an aiding and abetting claim. The Trustee's primary argument for the underlying breaches committed by Clairvest and the Board is that they dominated the sale process and controlled LMI to such an extent, that the results were a) an abdication of their duties in favor of Clairvest's interests, and b) failure to communicate or disclose anything with respect to the sale process, specifically from RBC.[102] Aptly put by RBC in its motion to dismiss, "[i]t is both illogical and nonsensical to conclude that Plaintiff sufficiently pled RBC's actual knowledge of the alleged breaches of fiduciary duty where Plaintiff has alleged throughout the Complaint that Clairvest withheld material information from RBC."[103]

While the foregoing Counts painted a broad picture of potentially actionable conduct by the Defendants, the Trustee has failed to plead even the minimum

---

[99] *In re Sharp Intern. Corp.*, 403 F.3d 43, 49-50 (2d Cir. 2005).

[100] *In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231, 272 (2008) (internal citations omitted).

[101] *Id.*

[102] Complaint at ¶¶ 4, 86.

[103] Adv. D.I. 102 at 13.

requirements for aiding and abetting against RBC in Count XIV.  As such, the Court will grant RBC's motion and dismiss Count XIV, with prejudice.

    *D.  Equitable Subordination and Disallowance of Claims (Claim X)*

        *1.  Clairvest Entities*

            *(a)  Inequitable Conduct*

                *(i)  Insider Status*

The particular type of misconduct deemed to satisfy the first prong of the equitable subordination analysis is dependent upon whether the alleged wrongdoer is an "insider" of the debtor.[104]  "When the claimant is an insider, the standard for finding inequitable conduct is much lower."[105]  As such, "[a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."[106]  The Court must, therefore, look at each party against whom Count X is alleged separately for purposes of determining insider status.

The Code defines an "insider" of a corporate debtor as including "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor.[107]  However, "[a] party may also be considered a 'nonstatutory insider,' even without actual control of the

---

[104] *United States v. State Street Bank and Trust Co.*, 520 B.R. 29, 81 (Bankr. D. Del. 2014) (citations omitted).

[105] *Id*.

[106] *Id*.

[107] 11 U.S.C. § 101(31)(B).

debtor, when there is a close relationship between debtor and creditor and when transactions between them were not conducted at arm's length."[108]

The Trustee puts forth a blanket assertion of insider status with respect to the Clairvest Entities, failing to specify exactly what aspect of section 101(31)(B)'s definition of an insider is applicable.[109]  In response, the Clairvest Entities—CLP, CGI, CLA, and CGM—argue that they are not insiders, statutory or otherwise, as the Complaint fails to adequately allege that Clairvest possessed sufficient control over LMI.[110]

Control, as enumerated in section 101(31)(B)(iii), is the only potentially applicable part of the definition of insider that would render the Clairvest Entities statutory insiders. Delaware courts have held that "activities such as monitoring the Company's business and attending board meetings are not sufficient to show control over the day-to-day operations."[111]  The Trustee has not argued, with specificity, any action on the part of the Clairvest Entities that would result in a finding of statutory insider status.  Yet, despite the fact that "not all of the enumerated insiders possess actual control over the debtor,"[112]

---

[108] *State Street Bank and Trust Co.*, 520 B.R. at 81 (citations omitted).

[109] Complaint at ¶ 241; Adv. D.I. 123 at 17, n. 41 (Trustee's Answering Brief in Opposition to Motion of Defendants Clairvest, et al. to Dismiss simply sites to the broad definition and examples of an insider provided by section 101(31)(B) of the Code).

[110] Adv. D.I. 140, p. 13.

[111] *Id.* (citing *In re Radnor Holdings Corp.*, 353 B.R. 820, 841 (Bankr.D.Del.2006)

[112] *In re Winstar Communications, Inc.*, 554 F.3d 382, 396 (3d Cir. 2009) ("For example, a 'relative of a general partner, director, officer, or person in control of the debtor" is an insider").  Although the "relative" referenced in section 101(31)(B)(vi) may not personally exert control over the debtor, insider status is predicated upon their close relationship to someone who *does* exert control over the debtor.  Thus, control is not absent as the Third Circuit asserts – it is still a necessary, present requirement in each of section 101(31)(B)'s enumerated examples, and to the extent 101(31)(B)(vi) does not *explicitly* demand personal control over the debtor by the insider, there still exists a nexus of control between the insider and the debtor, albeit one level removed.

this Court finds that the Clairvest Entities are not statutory insiders, as they do not fall within any of the enumerated examples defining "insider" under the Code.

*(ii)  Non-Statutory Insider Status*

While necessary for a finding of statutory insider status, the existence of control when determining non-statutory insider status is inapposite.[113]   In *In re Winstar Communications, Inc.,*[114] the Third Circuit affirmed the proposition that control is unnecessary for a finding of non-statutory insider status.[115]   Rather, the Third Circuit held, "the question 'is whether there is a close relationship [between the debtor and creditor] and … anything other than closeness to suggest that any transactions were not conducted at arm's length.' "[116]

In *In re Winstar*, Lucent, a creditor of debtor Winstar, in opposition to the Bankruptcy Court's finding Lucent to be an insider, argued that under the Second Credit Agreement, "the preference statute [cannot] penalize Lucent for conduct that was wholly permissible under the parties' freely entered agreements."[117]   The Third Circuit held that a finding of non-statutory insider status by the Bankruptcy Court was appropriate, and in rejecting Lucent's objection to such a finding, found "Lucent's contention that it was

---

[113] *Id.* at 396 ("We agree with Lucent that actual control (or its close equivalent) is necessary for a person or entity to constitute an insider under § 101(31)'s 'person in control' language.  However, a finding of such control is not necessary for an entity to be a non-statutory insider." (internal citations omitted)).

[114]  554 F.3d 382 (3d Cir. 2009).

[115]  *Id.* at 396.

[116]  *Id.* at 397 (quoting *In re U.S. Med.*, 531 F.3d at 1277).

[117]  *Id.* at 398-99 (quoting Appellant's Br. at 41).

merely driving a hard bargain and exercising its contractual rights … [un]persuasive."[118]

However, the Third Circuit emphasized that its finding of Lucent's non-statutory insider

status was predicated upon the specific facts surrounding the extent and manner of

interactions between Lucent and the debtor.  Specifically, *In re Winstar* held that the facts

or circumstances that compel a finding of non-statutory insider status by the Court must

rise above facts that simply demonstrate "exercise of financial control … incident to the

creditor-debtor relationship."[119]  To establish Clairvest was a non-statutory insider, the

Trustee must allege facts that Clairvest engaged in behavior other than that which is

considered incidental to a typical debtor-creditor relationship, such as evidencing the

ability to coerce or pressure LMI to use significant financial resources or facts alleging

that Clairvest used LMI "as a mere instrumentality to inflate [Clairvest's] own

revenues."[120]

     In the instant adversary proceeding, in response to various Claims contained in

the Complaint, Clairvest repeatedly asserts that simply advancing ones economic

interests, pursuant to contractual agreements, is not violative of any duties owed to

LMI.[121]  However, the LMI Shareholder Agreement "created an alignment of

interests…that provided a closeness that would affect the Company's dealings with

---

[118] *Id.*

[119] *Id.* at 399 (quoting *Johnson v. NBD Park Ridge Bank (In re Octagon Roofing)*, 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991)).

[120] *Id.* (quoting *In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 284 (Bankr. D. Del. 2005), aff'd, No. 01 01063 KJC, 2007 WL 1232185 (D. Del. Apr. 26, 2007), aff'd in part, modified in part, 554 F.3d 382 (3d Cir. 2009)).

[121] Adv. D.I. 99 at 13.

[Clairvest] and prevent a true arm's-length relationship between the entities."[122] Clairvest's cited support in moving for dismissal of claims relating to breach of fiduciary duties in its own Reply belies its assertion, made six pages later, that the Trustee's allegation of Clairvest's insider status is incorrect.[123]  In relation to its arguments moving for dismissal of alleged breach of fiduciary duty claims, Clairvest references the LMI Shareholder Agreement, arguing that "Clairvest had the right to require LMI to initiate and complete a sale process. … Clairvest had a contractual right to do just that."[124] Clairvest erroneously predicates insider status—statutory or non-statutory—on whether or not it "controlled" LMI.[125]  As case law has established, "control" of the debtor is not outcome determinative with respect to a finding of insider status in an equitable subordination analysis.  Furthermore, although "closeness" is not in and of itself determinative of non-statutory insider status, the Complaint alleges sufficient facts to support a finding by this Court that Clairvest is a non-statutory insider of LMI.

### (iii)  Non-Insider Status

Regardless of whether the Court determines Clairvest to be a statutory or non-statutory insider, equitable subordination is still appropriate absent insider status.  As observed by Judge Gerber in *In re Lois/USA, Inc.*,[126]

---

[122] *Id.*

[123] *Compare* Adv. D.I. 140 at 7 *with* Adv. D.I. 140 at 13.

[124] Adv. D.I. 140 at 7 (citing *Declaration of David T.B. Audley in Support of the Clairvest Directors' and Clairvest's Motion to Dismiss the Complaint*, Adv. D.I. 100, Ex. G ¶ 6.1).

[125] *Id.* at 13.

[126] 264 B.R. 69, 137 (S.D.N.Y. 2001).

> A non-insider's exercise of control over a debtor's operations, where that control is exercised in a manner to benefit that non-insider at the expense of other creditors, where a non-insider makes major decisions for the borrower, … and/or where it determines which bills would be paid, may, under certain circumstances, provide a basis for equitable subordination when that basis otherwise would be lacking.

The Complaint alleges sufficient facts supporting a conclusion by the Court that Clairvest falls into the above category of "where a non-insider makes major decisions for the borrower."[127]  Therefore, even if Clairvest is a non-insider, this Court still finds that a basis for equitable subordination has been sufficiently alleged by the Complaint due to Clairvest's enmeshed dealings with LMI.

### (iv)   Inequitable Conduct by Non-Statutory Insider or Non-Insider

The next question before the Court is whether Clairvest, as either a non-statutory insider or non-insider, engaged in inequitable conduct with respect to the Notes, as well as generally in its actions related to and involving LMI.[128]

While Clairvest argues that the Trustee has failed to identify any inequitable conduct, it restricts its analysis, upon which its conclusion is predicated, solely to its conduct relating to the Notes.  The Trustee, in response, argues that the Complaint, in addition to establishing inequitable conduct by Clairvest in connection with the Notes, sufficiently alleges facts establishing fiduciary breaches and Clairvest's engagement in illegal and fraudulent conduct.[129]

---

[127]  *Id.*

[128]  Complaint at ¶¶ 238-244.

[129]  Adv. D.I. 123 at 17.

31

As a threshold matter, the proof required to prove equitable subordination is dependent upon the creditor's insider status.  Judge Rosenthal, in *In re Winstar*, aptly summarized the different requirements depending upon insider status:

> When the creditor is an insider, the proof … is not demanding.  In such cases, a bankruptcy trustee need only show "material evidence" of unfair conduct.[130]   "For non-insider claimants, egregious conduct must be established to justify equitable subordination...."[131] … "[The degree of non-insider misconduct] has been variously described as 'very substantial' misconduct involving 'moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage' or as gross misconduct amounting to fraud, overreaching or spoliation."[132] Nevertheless the test is the same; only the standard of proof required differs.[133]

Generally, there are three recognized categories of misconduct that may be deemed to constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.[134]  However, it is accepted that "[t]he inequitable conduct underlying equitable subordination may be 'unrelated to the acquisition or assertion of the particular claim whose status [is] at issue.' "[135]  Furthermore, [t]he inability to fit

---

[130]  *In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 284 (Bankr. D. Del. 2005), *aff'd*, No. 01 01063 KJC, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009) (quoting *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir. 1986); *see also In re Epic Capital Corp., et. al.*, 290 B.R. 514, 524 (Bankr.D.Del.2003), *aff'd*, 307 B.R. 767 (D. Del. 2004)).

[131]  *Id.* (quoting *In re Mid–American Waste Systems, Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002)).

[132]  *Id.* (quoting *In re M. Paolella & Sons, Inc.*, 161 B.R. 107, 119 (E.D.Pa.1993), citing *In re Osborne*, 42 B.R. 988, 996 (W.D.Wis.1984)).

[133]  *Id.* (citing *Mid–American Waste Systems*, 284 B.R. at 70).

[134]  *Id.*

[135]  *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (quoting *In re Mobile Steel*, 563 F.2d at 701).

neatly the parties' actions within a specific heading does not make the misconduct any less inequitable."[136]

Fundamentally, as observed by numerous courts, "without question, cases of this character are fact intensive."[137]  The facts alleging inequitable conduct by Clairvest and Blum in the Complaint are broad, but they are not so lacking that this Court should grant Clairvest and Blum's motions to dismiss.  The same facts that provide the basis for finding Clairvest and the Board insiders warrant a finding that both Clairvest and Blum engaged in inequitable conduct by engaging in questionable actions resulting in its use of LMI as an instrumentality to gain an economic benefit not shared with others.  However, and similar to *In re Adelphia Communications Corp.*, "[t]he nature of the underlying conduct (and, at least arguably, any resulting injury) will have to be fleshed out as a factual matter – a task that is, of course, inappropriate when considering the motions under Rule 12(b)(6)."[138]

*(b) Injury to Creditors or Unfair Advantage on Claimant*

The second prong of the equitable subordination analysis requires a finding by this Court that the alleged inequitable conduct resulted in an injury to creditors or unfair advantage to Clairvest and Blum.[139]  With respect to harm to creditors, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the

---

[136] *State Street Bank and Trust Co.*, 520 B.R. at 82.

[137] *Id.* at 136.

[138] 365 B.R. at 69.

[139] *State Street Bank and Trust Co.*, 520 B.R. at 84.

bankrupt and its creditors suffered on account of the inequitable conduct."[140]  However,

the Third Circuit has observed that

> Quantification [of harm] may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer.  A bankruptcy court should … attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination.[141]

To the extent the alleged inequitable conduct by Clairvest and Blum resulted in harm to

other creditors or provided Clairvest with an unfair advantage, there are sufficient

factual allegations that support a conclusion that subordination would offset the harm

caused by inequitable conduct.

### (c) Consistency with the Provisions of the Bankruptcy Code

The final factor in an equitable subordination analysis requires the Court to

determine whether the subordination of the claim in question is consistent with the

Bankruptcy Code.  At this juncture, given the foregoing analysis requires additional

factual determinations, this Court will deny Clairvest and Blum's motions to dismiss

Count X in order to flesh out necessary facts to reach a final ruling on equitable

subordination of the claim.

---

[140] *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 413 (3d Cir. 2009) (quoting *In re Mobile Steel*, 563 F.2d at 701).

[141] *Id.* (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1989) (Citicorp I)).

    *E. Recharacterization of Notes as Equity Claims (Count XI)*

The Third Circuit has made clear that "the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution."[142]  Specifically, the Court must look to the intent of the parties with respect to the instrument in question.  Intent can be inferred from contracts, parties' actions, as well as from the "economic reality of the surrounding circumstances."[143]  Furthermore, the Third Circuit has directed Courts adopt a case-by-case approach to such an analysis instead of a mechanistic approach.[144]

In looking to the Sixth Circuit's eleven factor test articulated in *In re AutoStyle Plastics, Inc.*,[145] in addition to those pertinent factors identified by the Third Circuit in *In re Submicron Sys. Corp.*,[146] this Court assesses the following as relevant factors:

    (a) names given to the instruments, if any, evidencing the indebtedness;

    (b) presence or absence of a fixed maturity date and a schedule of payments;

    (c) no fixed rate of interest and interest payments;

    (d) whether repayment depended on success of the business;

    (e) inadequacy of capitalization;

    (f) identity of interests between creditor and stockholder;

---

[142] *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 572 (Bankr. D. Del. 2012) (quoting *In re Fedders*, 405 B.R. at 554).

[143] *Id.*

[144] *Id.*

[145] 269 F.3d 726, 747-48 (6th Cir. 2001).

[146] *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006) (citing *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984)).

(g) security, if any, for the advances;

(h) ability to obtain financing from outside lending institutions;

(i) extent to which the advances were subordinated to the claim of outside creditors;

(j) the extent to which the advances were used to acquire capital assets;

(k) presence or absence of a sinking fund;

(l) presence or absence of voting rights; and

(m) other considerations.[147]

The Trustee alleges facts, and Clairvest does not dispute, supporting seven of the eleven factors in favor of recharacterization.[148]  Specifically, the Complaint alleges the following characteristics, typically weighing in favor of recharacterization:

- Inadequate capitalization in connection with the March 2010, September 2010, and February 2011 notes;

- Failure to try to obtain capital elsewhere;

- Subordination of the Notes to debt held by the Debtors' lenders; and

- Use of the advances to acquire or pay for the Debtors' capital acquisitions.[149]

Notably, the Trustee observes that the four out of eleven factors that weight against characterization "all relate to the terms in the documents themselves, terms that the Complaint alleges were not negotiated, but dictated by the majority shareholder."[150]  This Court has long been of the view that a mechanical, score-card approach should be

---

[147] *Id.*

[148] Adv. D.I. 123 at 19 ("Clairvest still attempts to argue that Count XI should be dismissed because of their claim that just four of the eleven factors weigh against recharacterization (Op. Br. 16)").

[149] *Id.*

[150] *Id.* at 19-20.

abandoned in favor of a more flexible, fact-specific approach to the weighing of factors.[151] At this stage of the proceedings, the Trustee has alleged plausible facts such that the Motion to Dismiss Count XI should be denied.

    *F. Breach of Contract Claim (Count XIV)*

    Upon initiation of a sale process by LMI, RBC was retained by the Company to provide certain investment banking and financial advisory services in connection with a possible strategic transaction on November 4, 2011.[152]  With respect to the retention of RBC, the Trustee alleges that, despite "interviewing" other investment banks for the mandate to sell LMI, Clairvest was "ultimately obligated to retain RBC, based on a pre-existing business relationship between Clairvest Entities and RBC."[153]  The Trustee further alleges that the Board, notably, was not made aware of Clairvest's pre-existing, non-LMI-related relationship with RBC at the time retention was approved by the Board.[154]  Ultimately, the Trustee alleges RBC breached the terms of its engagement, which served to establish that RBC owed duties solely to LMI and no other person or entity,[155] by (i) "performing duties for the Clairvest Entities' and the Clairvest Board Members' interests that were contrary to the interests of the Company,"[156] and (ii) failing to both attend and prepare presentations and analyses for Board and Special Committee

---

[151] *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 581-82 (Bankr. D. Del. 2012).

[152] Complaint at ¶¶ 69-71.

[153] *Id.* at ¶ 69.

[154] *Id.*

[155] *Id.* at ¶ 276.

[156] *Id.* at ¶ 277.

meetings,[157] and that LMI was substantially damaged as a direct and proximate result of RBC's breach of contract.[158]

RBC argues that the Trustee has failed to adequately plead the essential elements of a breach of contract, as the Trustee has failed to identify the provision of the Engagement Letter that was allegedly breached.[159]  Specifically, RBC asserts that the Trustee only "makes a single overbroad and vague reference to a breach of the 'obligations and duties as set forth in the engagement agreement.' "[160]

In the Trustee's response to RBC's Motion to Dismiss the breach of contract claim (Count XIV), the Trustee argues that the breach of contract claim is adequately pled as RBC knew it was expected to perform services for the Company, "namely, involving the Company and the Special Committee in the sale process and assisting the Company in otherwise evaluating a range of strategic alternatives to a cash sale," and failed to do so.[161] The Trustee maintains that RBC not only failed to communicate with the Board or Special Committee, but that RBC "only pursued transactions in keeping with Clairvest's goals."[162]

---

[157] *Id.* at ¶ 278.

[158] *Id.* at ¶ 279.

[159] D.I. 102 at 18.

[160] *Id.* at 19, citing Compl. ¶ 275.

[161] D.I. 127 at ¶ 5.

[162] *Id.*

Under New York law,[163] to state a claim for breach of contract, the Trustee must allege: "(1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages resulting from the breach."[164] Each factor need not be pleaded individually: "so long as plaintiff has submitted a short and plain statement of the claim showing that the pleader is entitled to relief,"[165] a contract claim under Rule 8(a) will be sufficiently stated.[166] However, "the failure to allege all four elements required under New York law to state a breach of contract claim will result in dismissal."[167]

New York courts have further held that "[i]n order to adequately allege the existence of an agreement, a plaintiff must plead the provisions of the contract upon which the claim is based."[168] Although a plaintiff "need not attach a copy of the contract to the complaint or quote the contraction provisions verbatim. … the complaint must at least 'set forth the terms of the agreement upon which liability is predicated…by express reference.' "[169]

---

[163] *See In re LMI Legacy Holdings, Inc.*, 553 B.R. at 244.  In its opinion denying severance and transfer of both of the Trustee's claims against RBC, this Court found that "the Trustee's breach of contract claim is governed by New York law" by virtue of the Engagement Letter's choice-of-law provision.  *See* Engagement Letter at ¶ 11.

[164] *K.Bell & Associates, Inc. v. Lloyd's Underwriters*, 827 F.Supp. 985, 988 (S.D.N.Y. 1993) (citations omitted).

[165] *Howell v. Am. Airlines, Inc.*, 2006 WL 3681144, *3 (E.D.N.Y. Dec. 11, 2006) (internal quotations and citations omitted).

[166] *In re Adelphia Communications Corp.*, 2007 WL 2403553, *4 (S.D.N.Y. Aug. 17, 2007).

[167] *Id.* (citation omitted).

[168] *Id.*

[169] *Id.*

The contract at issue is that of the Engagement Letter, entered into between LMI and RBC in November 2011. The breach of contract claim against RBC is predicated upon RBC's alleged failure to explore strategic alternatives, in addition to giving weight to Clairvest's preferences with respect to the sale of LMI to the exclusion of the Board and Special Committee, and ultimately to the detriment of the Company. In response, RBC moves to dismiss the breach of contract claim as "grossly conclusory," in that the Trustee's Complaint fails to identify a provision in the Engagement Letter that was supposedly violated.

To survive a motion to dismiss, the Trustee "must, at a minimum, allege the terms of the contract and the elements of the alleged breach … ."[170] Ultimately, at issue is whether the Trustee's claim for breach of contract against RBC is predicated upon overly-broad generalizations, such that the claim fails to sufficiently plead, with specificity, the contractual provision that was allegedly breached, as required under New York law. The Complaint, while somewhat broad, paints an overall picture that requires the Court to address factual inquires to more fully determine the extent of the behavior by RBC. As such, granting RBC's motion to dismiss pursuant to 12(b)(6) would be inappropriate at this juncture. RBC's Motion to Dismiss Count XIV will be denied.

G. *Avoidance and Recovery of Transfer Claims (Counts XV, XVI, XVII)*

The following Counts, brought against CGM, are addressed in this section:

---

[170] *Id.* at *5.

- <u>Count XV</u>: Avoidance and Recovery of Preferential Transfer Pursuant to 11 U.S.C. §§ 547 and 550 (Claim XV)

- <u>Count XVI</u>: Avoidance and Recovery of Intentional Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544, 548, 550

- <u>Count XVII</u>: Avoidance and Recovery of Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544, 548, 550

   1. *Preferential Transfer Claim (Claim XV)*

At issue is an alleged transfer of an interest in the Debtors' property to CGM totaling $104,922.16 (the "CGM Transfer"). The Trustee maintains that the CGM Transfer was a transfer of property, or an interest in property, of one or more the Debtors. Furthermore, the Trustee maintains that CGM was a "creditor" of the Debtors as defined by 11 U.S.C. § 101, that the Transfer was made to or for the benefit of CGM or the Clairvest Entities, and was made on or within ninety (90) days before the Petition Date.

Clairvest admits in its motion to dismiss that the statutory elements of a preference action have been alleged by the Trustee, but argues that few, if any, additional facts supporting the Claim were alleged, the Complaint failed to specify which Debtor made the transfer, in addition to commenting on both the "relatively modest amount" of the alleged transfer.

The Trustee has sufficiently alleged facts required to survive a motion under Rule 12(b)(6). Clairvest does not challenge any of the factual allegations made in the Complaint that satisfy the pleading standard. Accordingly, Clairvest's Motion to Dismiss Count XV will be denied.

*2. Intentional Fraudulent Transfer Claim (Claim XVI)*

Under 11 U.S.C. § 548(a)(1)(A), [t]he trustee may avoid any transfer … of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

A claim for an intentional fraud is evaluated under Rule 9 pleading standards.[171] Although subject to a heightened pleading standard, there is significant interconnectedness with respect to the facts alleged that form the bases for the various claims to warrant the Court's denial the Motion to Dismiss Count XVI at this juncture, as necessary factual inquiries render a determination under Rule 12(b)(6) inappropriate.

*3. Constructive Fraudulent Transfer Claim (Count XVII)*

Under 11 U.S.C. § 548(a)(1)(B), [t]he trustee may avoid any transfer … of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —

---

[171] *Miller v. McCown De Leeuw & Co. (In re Brown Schools)*, 386 B.R. 37, 44 (Bankr. D. Del. 2008).

(B)

    (i)    received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (ii)

        (I)    was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

        (II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

        (III)    intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

        (IV)    made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

As a threshold matter, it is accepted that constructive fraud claims are analyzed under Rule 8,[172] and need not comply with the heightened pleading standards under Rule 9(b). The Complaint adequately alleges the elements of a constructive fraudulent transfer claim. Specifically, the Complaint (i) states the Debtors were insolvent at the time of the CGM Transfer and (ii) alleges a basis to infer that *any* transfer to a Clairvest Entity was for less than reasonably equivalent value to LMI.

As previously discussed, there are factual questions with respect to Clairvest's level of control over the LMI Board. In the instant Claim, Clairvest predicates a majority of its argument moving to dismiss Counts XVI and XVII on the rejection of any notion that it "controlled" LMI's Board. Given that there are factual questions as to the extent to which Clairvest controlled LMI's Board, it would be imprudent to make any

---

[172] *See In re Astro Power Liquidating Trust*, 335 B.R. 309, 333 (Bankr. D. Del. 2005).

determination under Rule 12(b)(6) for Count XVII.  Accordingly, the Court will deny the Motion to Dismiss Count XVII.

     *H.  Claim Objection (Count XVIII)*

     It is agreed across the parties—both Trustee and Defendants—that the viability of the Claim Objection (Count XVIII) is dependent upon the Court's determination of the Fraudulent Transfer Claims (Claims XV, XVI, and XVII).  Given the aforementioned claims survive, the Court will deny both Clairvest's and Blum's motions to dismiss Count XVIII.

## **CONCLUSION**

For the foregoing reasons, the following details the dispositions as to particular

Counts alleged in the Complaint:

| Count | Claim | Defendant | Defendant Group | Disposition of Claim |
|---|---|---|---|---|
| I | Breach of Fiduciary Duties against Board | (i) Sturdee, Rotman, Champsi, Horn, Torrie;<br>(ii) Rocco;<br>(iii) Finley, Schorer, Blum | (i) Clairvest (Directors)<br>(ii) LMI Management<br>(iii) Non-Clairvest Directors | Dismissed |
| II | Breach of Fiduciary Duties | (i) CLP, CGI, CLA, CGM;<br>(ii) Sturdee, Rotman, Champsi, Horn, Torrie | (i) Clairvest (Entities)<br>(ii) Clairvest (Directors) | Dismissed |
| III | Breach of Fiduciary Duties | Rocco, Burdi | LMI Management | Dismissed |
| IV | Avoidance and Recovery of Intentional Fraudulent Transfer | Rocco, Burdi | LMI Management | |
| V | Avoidance and Recovery of Constructive Fraudulent Transfer | Rocco, Burdi, Accumanno | LMI Management | |
| VI | Avoidance and Recovery of Intentional Fraudulent Transfer | RiteCare | RiteCare | |
| VII | Avoidance and Recovery of Constructive Fraudulent Transfer | RiteCare | RiteCare | |
| VIII | Turnover of Property of the Estate | Rocco, Burdi | LMI Management | |
| IX | Breach of Contract - Officer Notes | Rocco, Burdi | LMI Management | |
| X | Equitable Subordination and Disallowance of Claims | (i) CLP, CGI, CLA, CGM;<br>(ii) Blum;<br>(iii) Rocco, Burdi | (i) Clairvest (Entities)<br>(ii) Non-Clairvest Directors<br>(iii) LMI Management | Claim Survives |
| XI | Recharacterization of Notes as Equity | (i) CLP, CGI, CLA, CGM;<br>(ii) Blum;<br>(iii) Rocco, Burdi | (i) Clairvest (Entities)<br>(ii) Non-Clairvest Directors<br>(iii) LMI Management | Claim Survives |
| XII | Breach of Fiduciary Duties Relating to the Notes | (i) CLP, CGI, CLA, CGM;<br>(ii) Sturdee, Rotman, Champsi, Horn, Torrie;<br>(iii) Blum;<br>(iv) Rocco, Burdi | (i) Clairvest (Entities)<br>(ii) Clairvest (Directors)<br>(iii) Non-Clairvest Directors<br>(iv) LMI Management | Dismissed |
| XIII | Aiding and Abetting Breach of Fiduciary Duty | RBC | RBC | Dismissed |
| XIV | Breach of Contract - Engagement Letter | RBC | RBC | Claim Survives |
| XV | Avoidance and Recovery of Preferential Transfer | CGM | Clairvest (Entities) | Claim Survives |
| XVI | Avoidance and Recovery of Intentional Fraudulent Transfer | CGM | Clairvest (Entities) | Claim Survives |
| XVII | Avoidance and Recovery of Constructive Fraudulent Transfer | CGM | Clairvest (Entities) | Claim Survives |
| XVIII | Claim Objection | (i) CLP, CGI, CLA, CGM;<br>(ii) Blum;<br>(iii) Rocco, Burdi, Accumanno | (i) Clairvest (Entities)<br>(ii) Non-Clairvest Directors<br>(iii) LMI Management | Claim Survives |

An Order will be issued.